IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BARBARA BILLER,
    Plaintiff,

v.
                         Civil Action No. 2:09CV73
                         (Judge Maxwell)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
    Defendant.

**FILED**

JUL 2 2010

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion to Judgment on the Pleadings and Motion for Remand, Defendant's Motion for Summary Judgment and Response to Motion to Remand, and Plaintiff's Response thereto, and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P 86.02; Standing Order 6.

## I. Procedural History

Barbara Biller ("Plaintiff") filed applications for DIB and SSI in December 2005, alleging disability beginning in January 2003,[1],[2] due to herniated disc, arthritis, depression, and bipolar

---

[1]Plaintiff originally alleged an onset date in 1998, but later amended it to 2003.

[2]Plaintiff's Date Last Insured ("DLI") December 31, 2003. She therefore must show she was disabled on or before that date to be eligible for DIB benefits. There is no such requirement for SSI, however.

disorder (R. 11, 65, 150, 455). Both applications were denied initially and on reconsideration (R.45, 50, 444, 450). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Drew A. Swank held on August 22, 2008 (R. 470). Plaintiff, represented by a non-attorney representative, was present and testified. The ALJ did not call a Vocational Expert ("VE") . On September 24, 2008, the ALJ issued an unfavorable decision (R. 20). Plaintiff filed a Request for Review. She did not submit additional evidence to the Appeals Council. On April 21, 2009, the Appeals Council denied Plaintiff's request for review (R. 2), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Barbara Biller ("Plaintiff") was born on January 25, 1970, and was 38 years old at the time of the ALJ's decision (R. 477). She completed the 9th grade and obtained her GED (R. 477). She has past work experience doing landscaping, film developing for WalMart, assembly, stock work, and for the United Way (R. 479).

On June 11, 2002, Plaintiff presented to Regional Mid-Shore Mental Health Services ("Mid-Shore") for an intake evaluation (R. 426). She described a history of depression and possible panic attacks. She reported having been raped nine years earlier and was currently caring for her 8-year-old son who suffered from mental retardation and was a product of that rape. She denied suicidal or homicidal ideations but identified multiple issues that she wanted to address in therapy.

On about June 18, 2002 (date illegible) Plaintiff reported to Mid-Shore for an individual therapy session (R. 426). Her mood was dysthymic. She said her youngest son had had surgery and was doing fine. She discussed her history of rape and abuse by a relative, and said she was still struggling with issues due to these violations. She had a very poor relationship with her family.

2

On about June 25, 2002 (date illegible) Plaintiff presented to Mid-Shore for individual session (R. 426). Her mood was anxious and irritable. She reported she had had an altercation with her sister-in-law. She had difficulty completing her homework assignment from the prior session. She and her husband were denied a loan for a car and continued to struggle financially.

On June 26, 2002, Plaintiff's individual treatment plan at Mid-Shore indicated her problems were mood swings, anger management, familial relationships, finances, and history of unresolved sexual issues (R. 392). Her diagnosis was major depressive disorder, recurrent, moderate. Her current GAF was 45.[3] Her goals were to comply with treatment; learn and practice anger management techniques; and address and resolve her history of sexual abuse.

On July 12, 2002, Plaintiff presented to Mid-Shore for an individual therapy session (R. 425). Her mood was depressed and irritable. She reported having issues with her husband's son, stating that the son would be moving back in with his mother in two weeks. She also complained of sciatica pain for the past week causing her to "be down." She continued to struggle with financial and family problems.

On July 15, 2002, Plaintiff presented for an individualized therapy session (R. 425). Her mood was slightly improved. She reported having had a good weekend. She was still having behavioral issues with her boyfriend's son. She had multiple somatic complaints of pain and discomfort and was considering applying for Social Security Disability. She was worried about financial obligations. She denied any audio or visual hallucinations.

---

[3] A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

On July 19, 2002, Plaintiff presented for an individualized therapy session (R. 425). Her mood was improved. Her husband's son had left to move back with his mother. Plaintiff complained of back pain and said she would be getting an x-ray that day. She reported feeling less violent and had been practicing her anger management techniques.

On July 22, 2002, Plaintiff presented for a therapy session (R. 425). Her mood was ok. She had been prescribed Flexeril for her back. Plaintiff canceled her July 26 appointed due to back pain.

On August 6, 2002, Plaintiff underwent a psychiatry consult, on referral by her regular physician (R. 422). Her chief complaint was that she was depressed and her moods went up and down. Her family history was positive for depression. Her son had mental retardation and behavioral problems. She said she had attempted suicide two years earlier. She moved to New Jersey nine months earlier with her fiancee. She had not slept for two days. She said she had been diagnosed with bipolar disorder when she lived in Pennsylvania, and had been prescribed Depakote, which she felt was helpful.

Mental Status Examination showed Plaintiff's affect dysphoric and her mood ok, with no delusions. She was fully alert. Her immediate memory was normal, recent memory was less so. She was diagnosed with bipolar disorder, with a son with mental retardation, and a GAF of 58.[4]

On August 19, 2002, Plaintiff presented for individual therapy, reporting her mood had been good (R. 421). She felt better since taking Depakote. Her home environment was much better since her husband's 15-year-old son moved out.

---

[4]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

On August 20, 2002, Plaintiff reported to her psychiatrist that she was doing much better with Depakote (R. 421).She appeared calm, with no delusions and good insight.

On August 27, 2002, Plaintiff presented for her therapy session (R. 421). Her mood was irritable and depressed. She was struggling with her son's behavior, and was glad that he would be going back to school. She was referred to participate in a women's group now that her son was in school.

On August 28, 2002, Plaintiff began meeting with the "survivors' group" at Mid-Shore Mental Health Services (R. 420). She interacted with the group spontaneously, listened attentively, was supportive of group members, focused on others' problems, showed feelings, focused on the leader, and focused appropriately. Her behavior was appropriate. Her affect was appropriate. She participated well in the group and at the end of the summer picnic.

On September 4, 2002, Plaintiff attended the "Bipolar Group" at Mid-Shore Mental Health (R. 418). She interacted with the group spontaneously, listened attentively, was supportive of and focused on others' problems, showed feelings, focused on the leader, and focused appropriately. Her behavior, however, was irritable and sarcastic "due to problems at home." She was able to relate well to the group's topic of the day: "Reactions to stress." Her affect was appropriate.

On September 6, 2002, Plaintiff presented for therapy (R. 419). Her mood was depressed and irritable. She reporting her son was having behavioral problems- "acting out." She was frustrated. She also had a bad "flea" problem at home, that had been exterminated several times already. She was afraid she would have to move soon. She wanted to quit smoking. She had been participating well in the women's groups.

Plaintiff presented for therapy on September 10, 2002, in an irritable and anxious mood (R.

419).  She had had a verbal altercation with her spouse and had been very upset, feeling "put down." She said she could not remember things and thought she was losing her short-term memory.  She identified issues with communication and self-esteem.  She questioned whether her medications were causing side effects because she was tired all the time, irritable, and couldn't remember recent events.  She participated well in weekly group sessions.

Plaintiff attended her "survivors' group" on September 18, 2002 (R. 417).  She participated well, interacted spontaneously, listened attentively, was supportive of group members and focused on others' problems, showed feelings, focused on the leader and focused appropriately.  Her behavior and affect were both appropriate.

On September 23, 2002, Plaintiff presented for her therapy session  (R. 416).  She said her mood was irritable and depressed.  She reported more behavioral problems with her son and was also upset with her husband's absences.  He only came home 1-2 days every few weeks.  She felt their relationship was deteriorating to a lack of communication.  She also had concerns about finances and the need to get a new place to live.  She felt dominated by her husband.  She was participating well in her groups, and had formed friendships with other clients.

At a psychiatric followup in September, 2002, Plaintiff complained of feeling irritable and depressed and not able to sleep until 1 am, but then not able to wake up in time to put her son on the school bus.  She felt depressed.  Her appetite was too much, but her insight was good, and judgment intact.  The psychiatrist increased her Depakote, and added sleep medication.

Plaintiff attended her survivors' group on September 25, 2002, and participated well (R. 415).  Her behavior and affect were appropriate.

On September 30, 2002, Plaintiff presented for her individual therapy, reporting her mood

was improved (R. 414). She reported having had a good weekend with her significant other. The therapist "assisted client in completion of SSDI paperwork." Plaintiff participated well in weekly group sessions.

Plaintiff participated well in her October 2, 2002 bipolar group (R. 413). Her behavior and affect were appropriate. The group leader said she interacted well with others and encouraged their participation.

Plaintiff participated well in her survivors' group therapy meeting on October 9, 2002 (R. 412). Her behavior and affect were appropriate. She was "very interactive with other members"

On October 10, 2002, Plaintiff told her therapist she was "not feeling good" (R. 414). She said she had to have a breathing treatment the day before and had been using a nebulizer. Her boyfriend was still working in West Virginia and only came home 1-2 days per week. She had been looking for a house to rent because she was facing eviction. She was participating well in her weekly groups. She had a pending appointment with the State agency to apply for food stamps and other benefits.

On October 15, 2002, Plaintiff told her psychiatrist that since her breakup with her boyfriend she had to find a new place to live (R. 411). She felt better with the increased medication. She was sleeping about 5 ½ hours. She did not increase her Trazadone because she was afraid of getting too sedated. She felt she was coping despite stress, and felt it was for the best to end the relationship with that boyfriend.

On October 15, 2002, Plaintiff was tearful and upset, because her boyfriend told her she had to move out by the weekend (R. 411). He was verbally, but not physically abusive. She wanted to be referred to a Targeted Case Manager. The therapist said she could do that and would sign forms

for her to see Dr. Bearse.

On October 17, 2002, Plaintiff presented for individual therapy (R. 410). She was very depressed and tearful at times. She said she and her significant other were breaking up. He had been verbally abusive to her and her son. She was unable to endure it anymore and was searching for housing to get out of her current residence as soon as possible. She denied suicidal or homicidal ideation. She was waiting for intake by the Targeted Case Manager.

On October 18, 2002, Plaintiff presented for her individual therapy session (R. 410). Her mood remained depressed. She had had a breathing attack that morning and had to have a nebulizer treatment. She was scheduled to meet with the Targeted Case Manager. She remained adamant about leaving her significant other.

On October 22, 2002, Plaintiff presented for her therapy session (R. 410). Her mood was mildly anxious but improved. She said her significant other came home yesterday and they discussed their problems and were attempting to work through them. They may be moving closer to his job.

Plaintiff attended her survivors' group on October 23, 2002 (R. 409). She participated well and was very interactive with and supportive of the other group members. Her behavior and affect were appropriate.

On October 29, 2002, Plaintiff was informed she would have to discontinue Depakote due to abnormal liver function tests (R. 407).

Plaintiff attended her survivors' group on October 30, 2002 (R. 408). She provided a lot of information to the group regarding the day's topic: "mood swings." Her behavior and affect were appropriate.

On November 2, 2002, Plaintiff was called regarding the liver function tests and symptoms

(R. 407). Her primary doctor was running hepatitis screening. Plaintiff was complaining of vomiting, fever, rash, malaise, and decreased appetite. She did not have jaundice.

On November 4, 2002, Plaintiff presented for her individual session, reporting hepatitis C had been ruled out (R. 407). Her mood was depressed. She had a sonogram scheduled to rule out gallbladder problems. She complained of pain on her right side.

Plaintiff attended her bipolar group on November 6, 2002 (R. 406). She was very talkative--well engaged with group members and contributed a lot to the day's discussion: "coping with the holidays." Her behavior and affect were appropriate.

On November 8, 2002, Plaintiff presented for individual therapy (R. 407). Her mood was depressed, and she reported feeling "out of whack; unfocused." She said she felt "funny" since being off Depakote.

On November 12, 2002, Plaintiff presented for a psychiatric appointment (R. 405). She had had to discontinue Depakote due to the liver function tests. She said she was diagnosed with "bacteria that causes stomach ulcers"[5] and had been prescribed an antibiotic. Her mood was down, and her sleep had been light with Trazadone. She had tried the suggested increased dosage but felt it made her feel "high." Her affect was dysphoric.

On November 12, 2002, Plaintiff presented for her individual therapy session (R. 404). Her mood was dysphoric. She said she felt "out of whack" and had not been feeling good since she had the bacterial infection. She expressed difficulty with mood swings.

On November 19, 2002, Plaintiff's psychiatrist noted Plaintiff had canceled her appointment with him because her family was in town and she wanted to spend time with them.

_____

[5]H. Pylori, as noted on a lab test.

9

On November 21, 2002, Plaintiff presented for her individualized therapy session, reporting having bad "mood swings" – she felt happy one minute and sad the next. She had been removed from Depakote and she was scheduled for a psychological appointment in a few days. She complained of some withdrawal symptoms–shaking and tremors in her hands. Her relationship with her significant other was improving. They were still looking for a new residence.

On November 25, 2002, Plaintiff presented for her individual therapy session (R. 404). Her mood was good. She reported having mood swings, and was looking forward to seeing the psychiatrist the next day. She said she had had some suicidal ideation over the past week but denied any currently. Her relationship with her significant other continued to improve.

On November 26, 2002, Plaintiff told her psychiatrist she felt better, but had "ups and downs" (R. 403). She was easily frustrated with occasional suicidal ideations. She felt she needed new meds. She was started on Neurontin.

Plaintiff attended a "Women's Issues" Group on November 27, 2002 (R. 402). She was very talkative and enjoyed the topic and luncheon. Her affect was appropriate and her behavior "hyper talkative at times." The topic was "Giving Thanks."

Plaintiff attended her Bipolar group session on December 4, 2002 (R. 401). She participated well in the discussion and was very considerate and supportive of others. Her behavior and affect were appropriate.

On December 10, 2002, Plaintiff told her psychiatrist the medications were making her feel "so good" but wore off in the evening (R. 403). She was getting 6-7 hours of sleep. She felt the Neurontin helped her feel good about herself. Her affect was bright. She had a friend staying with her which she enjoyed. She said she could "wake up every morning and feel happy that I'm there,"

and that she was calm and could handle things better.

Plaintiff presented for her individual therapy session on December 11, 2002 (R. 399). Her mood was good. She still had company staying at her home. Her relationship with her boyfriend was good and she was looking forward to the holidays. She remained compliant with her medications and therapy.

Plaintiff attended her survivors' group session on December 11, 2002 (R. 400). She participated well in the group discussion and her behavior and affect were appropriate.

Plaintiff presented for her individual therapy session on December 13, 2002 (R. 399). Her mood was dysthymic and she reported feeling fatigued. She had been working hard on holiday preparations. Her houseguest had moved. Her relationship with her significant other was going well. She remained involved with her weekly groups.

Plaintiff presented for her individual therapy session on December 16, 2002 (R. 399). Her mood was dysphoric and her affect restricted. She reported feeling tired, stating that she and her significant other had a verbal altercation yesterday and she was very upset. She said she had some swelling in her feet and had a bad asthma attack yesterday.

Plaintiff attended her womens' issues group on December 18, 2002 (R. 398). The topic was "Christmas." She participated well and enjoyed herself. Her behavior and affect were both appropriate.

Plaintiff presented for her individual therapy session on December 20, 2002 (R. 399). Her mood was depressed. She said she was "tired of feeling tired." She had to reapply for benefits today, and had an appointment with Social Security on December 30.

A review of Plaintiff's individual treatment plan by Mid-Shore on December 20, 2002,

indicated she was diagnosed with bipolar disorder (R. 391). She also reported endometriosis, chronic allergies, and a history of kidney stones. Her current GAF was 55, and the highest in the past year was stated as 45. Her problems included mood swings, housing, finances, history of sexual abuse and familial relationship problems. She was taking Neurontin, Effexor, and Trazadone. Progress notes stated she had resolved her relationship problems with her significant other and she had mastered anger management techniques. Her goals were listed as remaining compliant with appointments and medications; obtaining appropriate housing; addressing and resolving issues of sexual abuse; and obtaining SSDI.

Plaintiff presented for individual therapy on December 24, 2002 (R. 397). She felt depressed and said she was tired of having medical problems. She and her family were going to West Virginia for the holidays.

Plaintiff presented for her individual therapy session on December 31, 2002 (R. 397). She reported she was moving to western Maryland. She was ambivalent regarding the move. She felt "numb" and continued to have intermittent arguments with her significant other. Her son had been exhibiting "acting out" behavior. She denied suicidal or homicidal ideation.

Plaintiff saw her psychiatrist that same date (R. 397). She felt she had better anger control and felt more self-confident. She could tell people what they were doing that bothered her. She was diagnosed with Bipolar disorder, depressed, with a GAF of 65.[6] She advised that she was moving to western Maryland.

---

[6]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

On January 3, 2003, Plaintiff reviewed her lab results with her therapist (R. 396). Her blood sugar level was high, but she said she had had coffee with creamer prior to the blood draw. She was moving to Maryland soon, and would decrease her sugar and carbohydrate intake.

On January 6, 2003, Plaintiff presented for her final individual session before moving (R. 396). She felt depressed and questioned if her blood sugar was running high. She felt very bad physically. The therapist recommended she make an appointment with her primary care physician. She was not looking forward to moving.

On January 8, 2003, Plaintiff attended her final bipolar disorder group session (R. 395). She participated well in the discussion and festivities. Her behavior and affect were appropriate.

Plaintiff's case was closed by Mid-Shore on January 17, 2003 (R. 394). Her case manager stated she had met most of her treatment goals, and her prognosis was good. She noted that Plaintiff would need medication monitoring. Her discharge diagnosis was bipolar disorder, and GAF 55.

On March 3, 2003, Plaintiff presented for an individual therapy session (R. 393). Her mood was depressed and she was tearful at times. She stated she had not felt well since her Neurontin was increased, and she wanted to request it be decreased. She and her significant other were getting along better since moving.

On July 2, 2003, Plaintiff underwent a Psychiatric Evaluation performed by psychiatrist Jamal Fawaz, M.D. (R. 389). Plaintiff complained of a long history of depression and anxiety with a past diagnosis of bipolar, seasonal affective disorder, and anxiety (R. 389). She reported her mood had been relatively stable on her current medications, but she had gained a significant amount of weight. She was on Effexor, Trazadone, and Neurontin. She reported ongoing excessive worry, feeling tense and on edge, irritability and at times excessive sedation. Her moods had generally been

stable. She had no psychotic symptoms, suicidal ideation or manic symptoms. She had recent stressors, however, including moving to a new area, a son with a disability, and financial and medical problems.

Plaintiff reported no prior inpatient psychiatric treatment, but said she had been in treatment since 1991. She reported her father had a history of depression and substance abuse, but there was no other psychiatric history in her family.

Upon mental status examination, Plaintiff was cooperative, had fair eye contact, and normal psychomotor rate and speech. Her mood was fair and her affect slightly constricted. Her thought processes were goal directed, and with no audio or visual hallucinations or delusions. She was fully alert and oriented. Her immediate, recent, and remote memory were intact. Concentration was good, and fund of knowledge, insight, and judgment were fair.

Dr. Fawaz diagnosed Major Depression, recurrent; Generalized Anxiety Disorder; rule out Bipolar Disorder, NOS; and a GAF of 69 (R. 390). He continued her medications.

On October 10, 2003, Plaintiff presented for the first time to Behavioral Health Partners ("BHP") for care of her bipolar disorder (R. 322). She underwent an Initial Evaluation. She complained of depression since post-partum depression and abuse by her first husband many years earlier. She complained of poor sleep. On mental status exam she was fully oriented, calm, cooperative, and related well to the interviewer. Her speech was logical, relevant, goal directed, and her thought content was appropriate. Her mood was depressed, anxious, and sad. Her affect was appropriate but blunted, her attention and concentration were fair, and her judgment and insight were good. Her memory and fund of knowledge were adequate. She was diagnosed with Major Depressive Disorder recurrent; Anxiety Disorder NOS; and rule out Bipolar Disorder. Her GAF

was 50.[7]  He prescribed Topamax.

On October 24, 2003, Plaintiff presented to Behavioral Health Partners complaining of stress secondary to problems getting her son's prescriptions (R. 329).  Upon mental status exam she was cooperative.  Her mood was depressed.  She was assessed with Major Depressive Disorder that was a lot better but with Anxiety aggravated by stress and poor sleep.

Plaintiff followed up with BHP on November 21, 2003, with complaints of depressed mood and anger due to her migraine headaches (R. 329).  Upon mental status exam she appeared depressed with sad mood.  She was diagnosed with Major Depressive Disorder and migraine headache.

On January 22, 2004, Plaintiff followed up with BHP, complaining that her son was in the hospital.  Her mood was depressed (R. 328).  She was assessed with Major Depressive Disorder aggravated by stress, and Generalized Anxiety Disorder.

On February 26, 2004, Plaintiff followed up with BHP (R. 328).  She stated she still had stress at home regarding her son's illness but removed herself from the issue of her stepson.  Her mood was less depressed.  She was assessed with Major Depressive Disorder ("MDD")-better and Generalized Anxiety Disorder ("GAD")-better.

On April 2, 2004, Plaintiff followed up with BHP (R. 327).  Her mood was sad.  She was assessed with MDD and GAD both aggravated by stresses.

On May 7, 2004, Plaintiff presented to BHP for followup, complaining of poor sleep, but noting she had had a good day that day (R. 327).  She still had stressors with the adolescent in her home who lied, and her mood was sad and tired.  She was assessed with MDD and GAD aggravated

---

[7]Plaintiff contends the number is a 30, but it appears to the undersigned to be a 50.  Fifty is also more  consistent with the rest of the report.

by stressors.

On June 2, 2004, Plaintiff presented to Potomac Physicians with complaints of menstrual problems with a history of fibroids (R. 283). She also had had endometriosis, and depression for which she was being seen by a psychiatrist. She was diagnosed with dysmenorrhea.

On July 8, 2004, Plaintiff presented to BHP reporting her sleep was good but her headaches persisted–although less so on Topamax (R. 326).

On July 12, 2004, Plaintiff presented to gynecologist Charles Kim, MD, for her chronic pelvic cramps and menorrhagia (R. 388). She had a history of endometriosis 10 years earlier. The symptoms had been getting worse for one year. The pelvic exam showed possible endometriosis. The doctor suggested hormone therapy for three months with laparoscopy and D&C in the future.

On October 18, 2004, Plaintiff underwent laparoscopic surgery for an ovarian cyst, performed by Dr. Kim (R. 387). The cyst was about 5 cm in size. Postoperative course was uneventful.

On October 26, 2004, Plaintiff presented to Potomac Physicians for follow up of abdominal pain and dizziness on standing (R. 282). She was diagnosed with pelvic pain and discharge.

On October 29, 2004, Plaintiff presented to Potomac Physicians with complaints of right side, lower back, and pelvic pain (R. 281). She stated the pain was now very severe. On examination her right lower back was extremely tender as was the right lower quadrant of her abdomen. She was diagnosed with right lower quadrant pain/rule out appendicitis and ovarian pathologies. She was sent to the ER.

Plaintiff was admitted to the hospital on October 30, 2004, for her complaint of pain in the right flank that went around from back to front. A CT scan showed a 5mm opacity in the upper pole of the right kidney and a 3 mm calculus at the ureterovesical junction in the right side (R. 370).

Plaintiff was diagnosed with an acute kidney stone, discharged with a prescription for Percocet, and referred to a urologist if not better in the next two or three days.

On November 9, 2004, Plaintiff presented to urologist Daniel Lamont, for consultation regarding the acute onset of right back and flank pain (R. 367). She described her pain as 10 out of 10, sharp, and constant with nausea and vomiting. Her back showed no tenderness or masses. She was prescribed Percocet and Phenergan and was scheduled for a ureteroscopy, lithotripsy, and stent placement unless she passed the stone prior to that.

On November 11, 2004, Plaintiff underwent a cystoscopy, ureteroscopy, and insertion of a stent for her right ureteral calculous and right back, flank and abdominal pain (R. 363). The procedure appeared successful, as she was diagnosed post-operatively with no evidence of ureteral calculous.

On December 6, 2004, Plaintiff followed up with Potomac Physicians for complaints of sore throat, ear pain, stomach cramping (R. 280). She had had a radiology report showing increased stool. She was diagnosed with chronic constipation, acne, and migraines.

On December 29, 2004, Plaintiff underwent a second Initial Evaluation/Psychiatric Evaluation at BHP apparently due to a change of doctors there (R. 318). She complained of anxiety, with symptoms including being jittery, high strung, crying, mad, irritable, overwhelmed, sometimes as many as 4-5 times per day, headaches, recent heavy night sweats, only 3-4 hours of sleep, with lots of yawning, feeling tired and week, feeling she was back to where she started, not recalling anything that gave her pleasure, and needing to avoid crowded places. In the past Depakote worked very well but she had to stop taking it because of liver problems and low blood cell count. Nothing since had worked as well.

On Mental Status Exam, Plaintiff was fully oriented, calm, cooperative, and related well to the interviewer (R. 320). Her speech was logical, relevant, and goal directed and her thought content was appropriate. Her mood was depressed, anxious, and irritable, and her affect was appropriate. Attention and concentration appeared fair, memory and fund of knowledge adequate, and judgment and insight good. She was diagnosed with Major Depressive Disorder-recurrent, and Anxiety Disorder NOS; rule out Bipolar NOS. Her GAF was either 55 or 65 (R. 320).

On January 26, 2005, Plaintiff presented to BHP for follow up, reporting she was not doing much better (R. 326). She was tearful and could not stand being around people. Her mood was tearful, sad, and angry. She was diagnosed with MDD-recurrent; Anxiety; and rule out Bipolar Disorder.

On March 9, 2005, Plaintiff followed up with BHP with complaints that she was "not as good," and was anxious "even after people she was with have moved." Overall she felt less stressed, but had headaches and was "quite nervous." Her affect was appropriate but anxious and her mood was depressed. Her judgment was good and her thoughts logical. She was diagnosed with MDD and GAD.

On March 11, 2005, Plaintiff presented to Potomac Physicians with complaints of right ear pain, chest congestion, and sinus pressure (R. 277). She was diagnosed with acute bronchitis, asthma, and a visual/eye disturbance.

On April 5, 2005, Plaintiff presented to BHP with complaints she was "not doing very well," being anxious, irritated, worried, not feeling like leaving house, not being happy, and having no energy by afternoon (R. 316). She reported auditory hallucinations– "hearing noises not voices."[8]

_____

[8]Later, it was noted Plaintiff's auditory hallucinations may have been caused by Ambien.

She appeared sad and irritated with depressed mood, but appropriate affect. Her judgment was good, her thoughts logical, and her speech appropriate. She was diagnosed with bipolar disorder-depressed. Her medications were increased and it was noted she may need an additional medication for psychosis.

On May 5, 2005, Plaintiff presented to BHP for a follow up (R. 315). She said when she used up to 300 mg Effexor she did very well. Two days ago she ran out of Effexor and had serious withdrawal from it. She appeared upset, tearful and in pain. Her affect was tearful and her mood was irritable. She was diagnosed with Major Depressive Disorder– Recurrent, Severe, without psychotic features. She was to resume Effexor.

On July 6, 2005, Plaintiff presented to BHP stating she was doing well (R. 314). Her affect was appropriate and her mood was euthymic. She was diagnosed with Bipolar II Disorder and Major Depressive Disorder.

On July 27, 2005, Plaintiff presented to Potomac Physicians with complaints of vomiting and right side pain (R. 276). She was diagnosed with right flank pain.

On August 1, 2005, Plaintiff presented to Potomac Physicians with complaints of continued severe pelvic pain (R. 273).

On August 31, 2005, Plaintiff underwent a CT Pyelogram for her complaints of right lower quadrant abdominal pain (R. 348). The previously seen cystic structure on the left ovary was no longer seen, but she now had a 3mm right ovarian cyst and a 1 mm non-obstructing kidney stone.

On September 2, 2005, Plaintiff presented to Potomac Physicians with complaints of continued abdominal pain (R. 271). Her labs were normal. The pyelogram was reviewed and Plaintiff was diagnosed with mid back pain and an ovarian cyst.

Plaintiff presented to BHP that same day with complaints of being stressed out and frustrated over the ovarian cyst, headache, back spasm, and kidney stone. She had no problems with medications. Her affect was appropriate and her mood depressed and irritable. She was diagnosed with Major Depressive Disorder, recurrent, and Bipolar II Disorder.

On September 8, 2005, Plaintiff followed up with Potomac Physicians regarding her right side and back pain (R. 270). She also reported a sore throat, hoarseness, ear pain and postnasal drip. She was diagnosed with mid back pain and sore throat, probably due to post nasal drip.

On October 5, 2005, Plaintiff presented to orthopedist Hampton Jackson, M.D., for an orthopaedic consult (R. 332). Plaintiff's chief complaint was significant back pain, which she described as rib and back pain. There was no history of trauma. She brought in studies showing a normal CT scan of the head and a non-obstructing 1 mm "very small" kidney stone. An x-ray showed:

> [M]ild osteopenia, thoracic area more than lumbar area. The laminas really had minimal degenerative changes seen. All the disc spaces were relatively well maintained. There was no wedging of any dorsal vertebrae.

(R. 334). Dr. Jackson wrote:

> Physical examination is not very significant in that straight leg raising is negative. There is no reflex asymmetry, but she is tender over the dorsal spine with spasms at mid-dorsal spine and lumbar spine, with the usual restrictions of motion associated with myospasm.

(R. 332). Dr. Jackson's initial diagnosis was "low back pain" (R. 333). He opined: "This problem at times is associated with osteoporosis. A compression fracture needs to be ruled out and possibly thoracic or lumbar disc condition" (Plaintiff was 35). He referred her for an MRI and bone scan.

MRI of the thoracic spine showed no evidence of any herniation or stenosis and was

generally normal (R. 336). Lumbar spine MRI, however, showed left sided foraminal disc bulge at L4-L5 with a small central disc herniation at L5-S1 (R. 335).

Plaintiff presented to BHP on October 5, 2005, for followup (R. 310). She complained of worse back pain. Her affect was anxious and her mood was depressed, sad, and dysphoric.

A bone scan on October 20, 2005, showed no evidence of abnormal osseous uptake in the spine, but did show mild diffuse right-sided caliectasis, and mild caliectasis, upper pole, left kidney along with prominent left renal pelvis (R. 337). On March 21, 2006, a note was added by Dr. Heath to notify Plaintiff that the bone scan showed her bones were normal, but it also showed kidney stones and the reviewer was not sure of the significance of those.

On November 1, 2005, Plaintiff presented to BHP for follow up (R. 309). She said she felt very stressed out and was not sleeping. One Ambien did not help. Her medical problems had been on her mind, and was the reason she was irritable and angry all the time. She had no side effects from medications. Her affect was appropriate and her mood depressed. Her judgment was good. The diagnosis was Major Depressive Disorder, recurrent, and Bipolar Disorder.

Plaintiff followed up with orthopedist Dr. Jackson on November 2, 2005, complaining of being "still painful, but a really lot different" (R. 330). Her studies were back, and Dr. Jackson found her bone scan showed caliectasis more on the right than the left, a little bit on the lower pole on the left, and a history of kidney stones. Lower back MRI showed a small, central herniated nucleus pulposus at L5-S1, and a sub-annular herniation at L4-5. His diagnosis was herniated disc at L4-5 or L5-S1 "as partial source of the back pain." He recommended a lumbar epidural block series and continued her medications.

On December 2, 2005, Plaintiff presented to BHP for follow up (R. 308). She stated she had

back pain but could not find a doctor who would take Medicaid. Her meds worked well for sleep but pain was still interfering. Her affect was appropriate. She was diagnosed with MDD- recurrent, and Bipolar Disorder.

On February 10, 2006, Plaintiff presented to BHP for follow up, with complaints that back pain continued to be a problem (R. 307). Her ongoing stressors were back pain, kids, and husband. She was prescribed extra Effexor which she said helped for a few weeks. She believed her meds gave her hot flashes and caused itchiness. Upon mental status exam she was coherent, and her affect was appropriate but anxious (R. 307). Her mood was irritable. Thoughts were logical and there were no delusions or hallucinations. She was diagnosed with major depressive disorder and bipolar disorder, her Lamictal was increased, and she was continued on Seroquel and Effexor.

On March 16, 2006, Plaintiff filed a Function Report, reporting her daily activities as follows:

> Wake up spend every bit of ½ hr getting on my feet, take my medication, go to the rest room, go downstairs for coffee, get my son up for school, make sure he gets on bus, get changed. Make my bed, my son's bed, clean bathroom, by this time it's 11 o'clock am, need to rest up. Get back up from rest it's one o'clock, finish my chores for the day. Start dinner @ 5 p.m. and at 6:00 p.m. read with my son, from 6:45 to 7:00 help my son clean his room. Give him meds. at 6:00 p.m. and then I go to bed at 8:00, take my Seroquel wait for sleep and that's it.

(R. 128). She stated she prepared her own meals daily, including making complete dinners. Once dinner was in the oven or on the stove she would have to stop and get up in intervals because standing caused her back and legs to ache. She stated she could do the laundry if someone helped her carry it. She no longer did outside chores because yard work was very strenuous and she could not bend or walk for very long. She shopped two times a month for 1-2 ½ hours each time, for groceries and clothing. Her hobbies and interests included puzzles and sewing three times a month and reading every day. Her friends visited her on Saturdays and they would sit around talking and

playing cards. She said she had no problems getting along with family and friends, but did limit the amount of people because she could not "take stressful situations when people argue." She stated her conditions affected most of her postural and exertional abilities, but not her memory, concentration, understanding, following instructions, using hands, or getting along with others (R. 133). She could pay attention "for hours," finished what she started, and followed written and spoken instructions very well. She stated she got along very well with authority figures. She had oppositional defiance, but "with [her] meds [she] can cope." She had been fired or laid off from a job due to problems getting along with other people, but that was before she "realized [she] was bipolar." She used to get madder quicker and was very short with people. She did state she handled stress very poorly and changes in routine not well.

On March 20, 2006, Plaintiff presented to Potomac Physicians with complaints of diffuse back pain, including lower back pain from degenerative disc disease. She was referred to pain management, but said she could not find any in the nearest three counties that would accept her insurance.

As already noted, on March 21, 2006, a note was added to the bone scan report of October 20, 2005, directing someone to notify Plaintiff that her bone scan showed kidney stones and the reviewer was not sure of the significance.

Plaintiff followed up with BHP on April 4, 2006, with complaints of her boyfriend telling her to leave because he was seeing someone else (R. 312). Plaintiff was very distraught. Her affect was tearful, angry and sad, and her mood was depressed. She was diagnosed with major depressive disorder.

On April 5, 2006, Plaintiff presented to Potomac Physicians for follow up of vomiting and

fever (R. 268). She was diagnosed with possible viral gastroenteritis and upper respiratory infection.

An Adult Progress Note from Shenandoah Valley Family Health Center dated June 17, 2006, noted Plaintiff had presented for blood pressure problems, ringing in her ears, and trouble hearing in her right ear (R. 265). She also complained of pain at a level 8 out of 10 in her shoulders and back. She also said she had problems with moods, getting angry easily. She was seeing a psychiatrist, Dr. Jurand. She also stated she had problems with anxiety. She also complained of some lower extremity swelling and chest pain when anxious which only resolved when she calmed down. She also complained of constipation for a year. She planned a vacation in Delaware and was looking forward to it.

Upon examination, Plaintiff's blood pressure was high (R. 266). Lung sounds were normal. Her mood and affect were simply checked as "abnormal." Her heart beat was tachycardic. She appeared anxious, with pressured speech. She had no lower extremity edema. She was prescribed blood pressure medication and a laxative.

Plaintiff underwent a neurosurgical consultation conducted by Ravi Yalamanchili, M.D. on August 15, 2006 (R. 225). On physical examination, Plaintiff was 5'5 and weighed 212 pounds. Motor exam was normal. Sensory and reflex exams were normal. Straight leg raising was negative bilaterally, and caused back pain. She had reproduction of back pain with flexion or extension. Gait was normal base and steady. The neurologist preliminarily diagnosed lumbago with lumbar spondylosis, but reserved recommendations until Plaintiff brought in her MRI.

On August 22, 2006, Plaintiff returned to Dr. Yalamanchili for follow-up (R. 224). She said she could not find her MRI. Upon physical examination, straight leg raising was again negative and motor strength was normal. She had reproduction of back pain with flexion or extension but no pain

with palpation of the lumbar spine. Gait was normal based and steady. Dr. Yalamanchili was going to order a new MRI "to see if there is any type of disk disease that could be accounting for her significant symptoms."

On August 26, 2006, Plaintiff underwent a consultative examination by Seth Tuwiner, M.D., for the State Disability Determination Service (R. 260). Her chief complaint was bipolar disorder, depression, arthritis, and back pain. Regarding activities of daily living, Dr. Tuwiner reported Plaintiff could clean and dress herself, drive for 30 minutes, and walk for 15 minutes, and had no limitation of fine manual dexterity (R. 261). On physical examination, Plaintiff had normal hygiene and affect, although she came into the room appearing dysphoric and expressing significant discomfort. She was slow in getting up and down from the examination table. She was 5'5 and 211 pounds. Her lungs were clear with some intermittent wheezing. Plaintiff was a smoker. She had a slow, cautious gait, which was antalgic. She did not put any weight on any specific extremity. She was wide based and cautious. She could walk on her heels but not her toes or tandem walk.

Cervical range of motion was normal (R. 262). Dorsolumbar range of motion was inconsistent. Forward flexion was 30 degrees lateral and backward extension was 10 degrees. Hip joint range of motion was normal. Plaintiff did not allow the doctor to do full range of motion with respect to abduction, which was only 50 percent of normal, with expressed pain. Adduction and backward flexion were normal. Knee and ankle range of motion were normal. The doctor noted Plaintiff's straight leg raising was inconsistent, with sitting SLR unremarkable, and lying with pain at 40 degrees bilaterally. All other ranges of motion were normal with no swelling, deformity, tenderness, or erythema. Strength was normal. Grip was normal.

Dr. Tuwiner diagnosed bipolar disorder and depression, and opined that her "current

psychiatric condition makes her embellish a lot of her current conditions" (R. 263). Her prognosis was contingent upon adherence to multidisciplinary therapy. He also diagnosed arthritis, despite noting that he "could not find any evidence of arthritis on my examination." He also opined her prognosis appeared to be good, but that nonetheless she was "at risk" for arthritis given that she was overweight. Finally, he diagnosed back pain. He noted her symptoms were consistent with an L4 radiculopathy, but on examination could not find any myotomal or dermatomal patterns suggestive of a radiculopathy. She had no signs consistent with spinal claudication. He noted her straight leg raises were inconsistent, but said, "nonetheless, this does not rule out a radiculopathy. However, I do believe that a lot of her symptoms are somewhat exacerbated." Finally, her prognosis was fair, "given that she is sedentary and does not engage in physical therapy." He opined she might benefit from physical therapy and weight reduction.

Dr. Tuwiner completed a functional assessment opining Plaintiff could perform at the light exertional level, and be expected to stand and walk about 6 hours in an 8-hour workday (R. 263). She would have no limitation on sitting, and did not require an assistive device. She could lift 30 pounds occasionally and 15 frequently. She would have occasional postural limitations. She had no manipulative limitations. Finally, Dr. Tuwiner opined Plaintiff had a severe mental illness, which may have other implications with respect to work.

On August 28, 2006, Plaintiff underwent a consultative psychological evaluation performed by Randolph McDonald, Ed.D., a licensed psychologist, for the State Disability Determination Service (R. 255). Plaintiff's chief complaints were herniated and bulging disks and bipolar illness, depressive type. She walked with a cane and with a limp, and her face showed pain. She said her legs, knees and joints hurt, that it was genetic, and that other family members had the same

26

problems. Plaintiff lived with her son who "is impaired mentally because of the ingestion of lead from paint, and he has also been diagnosed as bipolar" (R. 256).

Plaintiff said she had lost a lot of weight in the past six months (R. 256). She suffered from crying episodes and described her energy level as varying. She described her mood over the last two weeks as "edgy." She experienced panic attacks. She said she had attempted suicide about four years earlier by the over-ingestion of alcohol.

Dr. McDonald noted there were really no records of any substance to review, with the exception of one progress note from Shenandoah Behavioral Health which was "very hard to read." Plaintiff said she first sought mental help in 1991 and was put on an antidepressant for postpartum depression. She saw a psychiatrist and said that she had been seen several times at various clinics over the years, due to having moved around quite a bit. She said her physical health was ok until 1999, when she began to get sick and her joints began to stiffen. She was not sure "when she herniated the disk." Currently, she was maintaining but suffering a lot of pain. She was not currently receiving any medications for pain "because the pain management person she was seeing in Maryland has yet to forward her medical records to Shenandoah Medicine here in West Virginia." She denied any substance abuse history, other than the attempted suicide by ingestion of alcohol.

Upon mental status examination, Plaintiff was fully oriented with no evidence of hallucination or delusion (R. 257). She denied suicidal or homicidal thoughts. Speech was normal and her mood was broad. Her affect was sad. She described her thought content as confused and jumbled and her cognitive capability as slightly below average. Her insight seemed good and she described her judgment as good. Immediate memory was good but recent memory was poor. As to remote memory, Plaintiff said there were a lot of gaps in her own history. Regarding

concentration, Plaintiff attempted serial threes at least three times. Relying on the use of her fingers, she stuck at it for awhile but was unable to successfully get below the 70's.

During the evaluation, Plaintiff was cooperative and responded to every question. She self-reported, however, that she really had no social life. She said she got up every day about 6:30, and went to bed about 9 p.m. She attempted some vacuuming and light dusting, and helped with the cooking if her back was not too bad. She was now learning to crochet. She helped take care of her mother's houseplants, and helped take care of her son who was 12 years old and handicapped.

Dr. McDonald diagnosed Plaintiff with bipolar illness, depressive type, and herniated disk, stiff joints, damaged ankles and knees and chronic pain (R. 257). Her prognosis was fair and her capability was good.

Plaintiff underwent an Intake Evaluation with Behavioral Health Services of the Shenandoah Valley Medical System ("Behavioral Health Services") on August 31, 2006, conducted by a licensed social worker (R. 191). She told the evaluator she had just gotten out of an 8-year relationship with her husband, and just moved from Maryland, and her 12-year-old son had behavioral problems. She reported trauma from rape and sexual abuse as a child. Her youngest son was the result of a rape. She was molested by her uncle as a child and her husband physically abused her. Her medications were listed as Lamictal, Effexor, Topamax, Advair, and Adderall. Her diagnosis was ADHD v. Bipolar, and hypertension. Her rating for the past week on a scale of 0 (best) to 10 (worst) was 10 for anger/frustration, anxiety level, loss of sexual drive, financial problems, and absence from work (listed as does not work). Social Isolation was checked as a 9. Physical pain level and depression level were 7, self esteem was 6, and suicidal thinking and alcohol drug abuse were 0. Plaintiff told the therapist she was unable to do many things, and did not finish what she started, due to

medication, lack of energy, lack of ability to be around people, and "can't get enough sleep then I sleep too much." She noted she was "Bitchy, cranky, irritated, cranky, and moody." They discussed the possibility of ADHD. She had tried a low dose of meds but did not help. The plan was to try Adderall.

On mental status exam Plaintiff scored a 30, including fully oriented, could name three objects one at a time, spelled world backward, could name three objects after five minutes, followed commands, and could write a sentence and copy a design.

Plaintiff said she was fired from her last job for losing her temper and getting loud. She said she was "seeking disability." She said she had no friends and just got out of her romantic relationship. She did not have a need for people now and no tolerance for stupid people. She would like to build a better parenting relationship. She believed she was a good mom. She had problems with reading and understanding but liked crafts and sewing. Her goal was to stabilize her moods and get her medications.

Plaintiff also reported she had refused psychotherapy because of the distance she would have to travel, that she occasionally burned herself due to her arms twitching, and that she found bruises on herself that she could not explain (R. 196).

Objectively, Plaintiff was found to be alert and fully oriented, clean, and casually dressed, cooperative, with good eye contact, and a full affect (R. 198). Her mood was euthymic and her thought process and speech were logical. She reported auditory hallucinations when using Ambien. Her general fund of knowledge was good. Under symptoms, she reported weight loss, nightmares, hopelessness, anhedonia, helplessness, lethargy, decreased libido, racing thoughts, worthlessness, chest pains and palpitations, appetite disturbance and sleep disturbance. She described her moods

29

as down, especially at night or when alone. She found it hard to maintain her temper and had even physically assaulted people. Her GAF was listed as 60 (R. 200). The diagnosis was Bipolar Disorder and Anxiety NOS.

By September 2006, Plaintiff was listed as "doing well" overall (R. 204). Her diagnosis was ADHD (R. 189). She had no "10" ratings and her worst rating was a 7 out of 10 for pain level. She rated herself as 5 on a scale of 10 for depression, anger/frustration, anxiety, loss of sexual drive (which did not concern her), social isolation, and difficulty ambulating (walking) due to back problems. Her low self esteem was now listed as "good" at level 1 as was her sleep on Tylenol PM (OTC). The therapist reported he was "very impressed" with her improvement.

On September 22, 2006, State agency reviewing physician Cynthia Osborne, DO, completed a Residual Functional Capacity Assessment ("RFC") of Plaintiff, opining that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand/walk 6 hours in an 8-hour workday; and could sit 6 hours in an 8-hour workday (R. 245). She could never climb ladders, ropes, or scaffolds, and could only occasionally perform all other posturals. She should avoid concentrated exposure to extreme cold, hazards, and fumes, odors, dusts, gases and poor ventilation (R. 248). Dr. Osborne found Plaintiff partially credible and decreased her RFC to light with the further limitations noted.

On September 25, 2006, State agency reviewing psychologist James Capage, Ph.D. completed a Mental Residual Functional Capacity Assessment finding Plaintiff moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting (R. 226-227). Otherwise she was not significantly limited in any category. Dr. Capage concluded that Plaintiff had a severe mental impairment that did not meet or equal the listings (R. 228). It did, however, impose moderate limitations on her functioning. He concluded she had the mental-emotional capacity to perform routine work-related activities in a low-pressure setting.

Dr. Capage also completed a Psychiatric Review Technique ("PRT") based on bipolar syndrome, finding Plaintiff had a mild degree of restriction of activities of daily living, moderate difficulties maintaining social functioning and concentration, persistence or pace, and had had no episodes of decompensation (R. 240). Dr. Capage found Plaintiff capable and credible.

On October 9, 2006, Plaintiff was noted to have been doing well "until dosing of Adderall got screwed around. May not seem like something to you but it was helping me. Now I'm in even more of a stupor and a lot more dumbfounded than ever." It appears Medicaid denied Adderall and Plaintiff was appealing that ruling.

Two weeks later, Plaintiff stated she was "fixating on a project for days at a time until my energy seems to drain and I physically and mentally crash (I mean I can't lift head off couch)." Adderall was working well but she was "crashing and irritable" when it wore off. She was to get physical therapy for her back pain. Her Adderall was increased.

Plaintiff underwent a back evaluation with a physical therapist on November 2, 2006 (R. 222). Plaintiff rated her back pain as 4 out of 10 at best and 7 out of 10 at worst. Objectively, Plaintiff's left ilium was higher than the right. She was very tender along the lumbo/sacral spine and

right sacroiliac joint. She was diagnosed with sacroiliac joint dysfunction bilaterally, and lumbo/sacral sprain/strain/dysfunction. It was recommended she attend physical therapy twice a week for four to six weeks.

At her first physical therapy session on November 8, 2006, Plaintiff said she was in considerable pain, because she had to help her mother move things out of the kitchen (R. 221).

On November 10, 2006, Plaintiff still complained of pain since her last session (R. 221a).

On November 14, 2006, Plaintiff said she was still in considerable pain at therapy, but after that therapy said she had good relief and felt considerably better.

On November 16, 2006, Plaintiff said she was feeling better after her last physical therapy session (R. 221). Yesterday, however, she had twisted her body in the water and gravel, and was now feeling worse, mostly in her back. She had good relief with the session.

On November 20, 2006, the Adderall was working well. Plaintiff was working on family projects and her concentration was better (R. 186).

Plaintiff cancelled her physical therapy appointments on November 21 and 28 (R. 221).

On November 27, 2006, Plaintiff filed her Request for Reconsideration, alleging lower back, left leg, and left arm pain (R. 447). She said she was "still having problems with mobility and now the pain is shooting down the left leg and up my back to the left shoulder down the left arm to hand causing hand to be totally useless."

At her next physical therapy appointment on December 1, 2006, Plaintiff said her back, arm, and leg were hurting (R. 220). The therapist opined that Plaintiff possibly had disc or nerve radiculopathy since the effect of treatment was not longstanding and she had weakness. He suggested that pool therapy might really help. Plaintiff never returned to therapy.

32

On December 11, 2006, Plaintiff still rated her pain level as 8 (R. 185). She also rated as 8 her financial problems, difficulty ambulating, and absence from work (R. 185). Her depression was only at a level of 1 out of 10, and all others were rated at 0, including anger, anxiety, low self esteem, and social isolation. All her blood test results were negative. Overall she was doing well. She was socializing with her neighbors. Her left leg and arm hurt and were going numb, but she was going to therapy and was referred for an MRI. She was fearful of using narcotics.

State reviewing physician Atiya Lateef, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") on January 23, 2007, opining that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently (R. 213). She could stand/walk 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday. She should never climb ladders, ropes, or scaffolds, and could only occasionally perform other posturals. She should avoid concentrated exposure to extreme cold and vibration. Dr. Lateef commented that Plaintiff did have low back pain due to HNP of the lumbosacral spine. Her RFC was reduced to light. She also noted, however, that Plaintiff had failed to continue her physical therapy.

Plaintiff underwent an MRI of the lumbar spine on January 29, 2007 (R. 211). L1-4 were normal. At L4-5 there was a "very small" focal protrusion that may have impinged the left L4 nerve root. At L5-S1 there was a small posterocentral disc protrusion that impinged the anterior aspect of the thecal sac. The impression was that these findings were "very mild." It was suggested the findings be correlated with Plaintiff's described site of pain to see if a nerve root block was clinically warranted.

On February 5, 2007, Plaintiff reported passing kidney stones. She was going to have a CAT scan and MRI. Her mood was under fair control. Her pain level was reported as 7, as was her

absence from work, stated as "not able to do a lot because of back problems at this time." Financial problems were a 6, anger and anxiety were at 5 out of 10, difficulty ambulating was 4, and the remainder were 0, including depression, low self esteem, and social isolation. (R. 183.)

On February 15, 2007, Plaintiff submitted a Request for Hearing before Administrative Law Judge (R. 41). In it she stated that since her original claim, she had problems doing her daily activities on her own. She now lived with her mother whom she helped as best she could. She sat on a chair in the shower while her mother washed her hair because she was limited in how far she could lift her left arm or move it around before it hurt and went numb. Her left leg did the same. When she traveled, she had to pull her left leg with her right hand by the pants leg, then she had to rest and adjust the lumbar pillow on her seat to go and do her errand, which was only ten miles away (R. 41). She stated she had no additional evidence to submit.

On March 5, 2007, Plaintiff reported pain at level 8 and difficulty ambulating at level 7, but everything else at 0 (R. 182). She reported Flexeril was not working and she could not find anyone to give her an epidural on her insurance. She was trying to quit smoking and drinking coffee which was causing stress. She continued to have left arm and leg numbness. She continued to be diagnosed with ADHD and bipolar disorder.

On April 9, 2007, Plaintiff reported feeling tired from Ultram after her epidural (R. 181). Her depression was "ok" and Adderall helped the ADHD. She still rated her physical pain level as 7 but her ambulation problems were rated as 0. Also rated as 0 on a scale of 0 to 10 was her level of depression, social isolation, financial problems, and absence from work. She did rank her self esteem and anxiety as 4. She was diagnosed with ADHD.

On May 7, 2007, Plaintiff reported 8 out of 10 difficulty ambulating and 7 out of 10 pain

level, but level 2 of anger/frustration and 0 for everything else, including depression, anxiety, self

esteem, financial problems, and absence from work. She said she had two injections for headaches

and was still getting migraines every other day. She was doing well emotionally. She was diagnosed

with ADHD and Bipolar disorder.

On June 9, 2007, the Administration sent Plaintiff a letter advising it had received her request

for a hearing before an ALJ (R. 30). The letter expressly stated:

> Because the hearing is the time to show the ALJ that the issues should be decided in
> your favor, we need to make sure that your file has everything you want the ALJ to
> consider. We can help you get needed evidence . . . .

The letter goes on to state:

> **Providing Additional Evidence**
>
> If there is more evidence you want the ALJ to see, get it to us as soon as possible.
> If you need help, you should immediately contact our office or your local Social
> Security office, or your representative (if you appoint one). Evidence you cannot get
> to us before the hearing may be brought to the hearing.

(R. 40).

On June 11, 2007, Plaintiff reported her highest rating as a 6 for difficulty ambulating (R.

179). She described her pain at level 4 out of 10 and everything else as zero. She reported "the city

hospital radiology found several hundred small ulcers in [her] stomach and intestines."

On July 30, 2007, Plaintiff reported being treated for H. Pylori (bacteria causing ulcers). She

also claimed swelling of the hand, and a yeast infection. Her emotions were coming through and she

felt medically bad but psychiatrically stable.

On August 7, 2007, Plaintiff stated she may need some counseling, because her anger seemed

to be getting the better of her "and I guess I feel short-fused" (R. 177). She rated her anger and

anxiety as 4 on a scale of one to ten. She said she also had much back and hip pain. She reported that her first husband had beaten her daily for years and at times she felt like there was someone in the room or she dreamt about being abused. She awoke with night sweats and was easily frightened. She was awaiting approval for another epidural, but "stresses that psych issues are significant" and "asks us for help filling out disability papers."

One week later, Plaintiff attended a therapy session, during which she rated her anger and depression levels at 9 out of 10 (R. 176). She said her anger and feelings had been overwhelming. She reported crying a lot, and sleeping the majority of the day so she did not have to deal with issues in her life. She was happy when sleeping and waking up was like a nightmare. She was upset about the pain in her neck leading to migraines. She had frequent hot flashes and wanted to sleep all the time. She had increased agitation, anxiety and irritability. She said she was "sick of this — son neurologically impaired– son had lead poisoning as infant."

On September 11, 2007, Plaintiff attended another session where she said she was going to physical therapy, and was now referred for pain in her stomach and pain in general. She rated her pain at 7 as well as her difficulty ambulating. Her anger was 5 and her anxiety was 6.

On September 17, 2007, Plaintiff reported most ratings at 5 out of 10 (R. 174). She said she needed a medication to replace Effexor which she had stopped. She reported "feeling very uncoordinated and I feel like I'm time tracking throughout the day. I forget why I'm doing something." She complained of others monopolizing the group therapy sessions, yet she was talking. She was tearful and frustrated.

The next day, Plaintiff attended group therapy (R. 173). She was referred to a pain management clinic and would have a scan for osteopenia. She was to start on Cymbalta. Medication

was helping with the stomach spasms.

On September 25, 2007, Plaintiff attended therapy, where she reported pain at a level 6 and difficulty moving at a level 6 and everything else at 0 (R. 172). She reported the Cymbalta was working. She said she was mentally feeling great on Cymbalta with some relief from shoulder pain. Her pain was otherwise severe without a lot of dizziness and nausea. She appeared very stiff especially in the neck. She was conversational with the group members. Her diagnoses had changed from degenerative disc disorder and migraine to pain disorder. She still was diagnosed with ADHD, but not bipolar.

On October 16, 2007, Plaintiff reported to her mental health therapist that she hurt a lot, and had had no pain meds for ten days (R. 171). Breathing techniques were not helping and she had been under a lot of stress. The pain doctor could not see her without a referral. Her son was also having pain from an appendectomy and testicular surgery and was also out of meds.

On October 29, 2007, Plaintiff was diagnosed with ADHD and chronic pain (R. 170). She reported pain and anger at level 6 and anxiety at 7. She claimed she was taking Adderall q.i.d. (four times per day), but they only prescribed it t.i.d. (three times per day) and she did not run out. She was working with a Dr. Rezaian regarding arthropathy. She missed her appointment the past week because she was caring for her son after his two surgeries, and her son had an appointment tomorrow. Ultram and Prednisone were helpful.

On December 4, 2007, Plaintiff stated she was seeing Dr. Rezaian. She was taking Percocet, Vicodin and Ultram. She said she continued to have limited range of motion. She always looked stiff when walking or sitting. She was diagnosed with ADHD, chronic pain, degenerative disc disease, Migraine, and osteoarthritis.

On December 11, 2007, plaintiff looked stressed (R. 168). She said she was upset about a confrontation with the PA at her doctor's office. She got an appointment with a different provider. She was maintaining her temper under control despite provocations. People in church noticed that her anger had decreased. She was much less angry and aggressive than she used to be. She no longer judged people as she used to.

On January 7, 2008, Plaintiff questioned the Cymbalta, saying she had been putting on excess weight. She ate fruit and vegetables and walked when she could. She did not go anywhere, and hid at home, making excuses not to go out. Her feet hurt. She was frustrated by multiple problems and was still passing kidney stones. She felt Adderall was not helping, so it was discontinued. Cymbalta was increased. She was diagnosed with ADHD, chronic pain, degenerative disc disease and migraine.

On February 4, 2008, Plaintiff said she went up three pant sizes since starting Cymbalta and that if it was in fact the cause or contributing she did not want to take it anymore.

On February 29, 2008, Plaintiff was sent a letter scheduling her hearing for April 2, 2008 (R. 32).

On March 3, 2008, Plaintiff said Dr. Rezaian "diagnosed my fibromyalgia" (R. 165). This "seemed to take a lot of mental stress away," although "still struggling with pain on a daily basis." She felt very good working with Dr. Rezaian and her moods were better since working with him.

On April 7, 2008, Plaintiff reported her hearing had been postponed (R. 163). She was getting only three hours sleep. She discussed longer-acting pain options, including duragesic patches. She was prescribed the patch.

On May 5, 2008, Plaintiff stated she had no pain with the patch. The report is a bit confusing

because Plaintiff reports a physical pain level at 4 out of 10, but then notes specifically 0 pain w/ patch! (Exclamation in original). She was getting "much relief!" from Fentanyl patch (Exclamation again in original). Her anger and anxiety were down to a 2 and all else was rated as 0, including Depression and social isolation. This is the last report on record before the ALJ.

On July 2, 2008, the Administration sent a letter to Plaintiff scheduling her hearing for August 22, 2008 (R. 26). The letter expressly instructed:

> **You May Submit Additional Evidence and Review Your File**
> If there is more evidence you want to submit, get it to me right away. If you cannot get the evidence to me before the hearing, bring it to the hearing. If you want to see your file before the date of the hearing, call this office.

(R. 29).

At the Administrative Hearing held on August 22, 2008, Plaintiff testified she lived with her mother and her 14-year-old son who was in school (R. 477). She testified that she had been unable to work for the last ten years due to "a lot of chronic pain" (R. 481). She said the pain was in her upper joints, shoulders, wrists, and lower back. She also said she had carpal tunnel. She was using a Fentanyl patch for about four months and taking Tramadol for about a year. She said they helped her, but the help was "minimal. The pain was at a 7 on average, with the patch. She had had physical therapy but it did not help. She could stand for about 20 minutes then need to sit, and sit about 45 minutes then need to stand (R. 484). She could walk about 2 ½ blocks. She was not prescribed any ambulatory aid. She did have splints on her wrists, prescribed by Dr. Rezaian "a couple of weeks ago." Before that she used non-prescribed wrist straps. She also took Temazepam for sleep. She had been taking it for about two months.

Plaintiff testified she napped every day and only got about 5 ½ hours of sleep per night. Her

mother did the grocery shopping with her son's help (R. 486). She drove. She did not prepare any food, having stopped doing so in about 2005. She could sweep, dust, and do the dishes. She did no yard work and no child care. She had a hobby making jewelry until the past Christmas. She went to church every other Sunday. She needed help washing her hair.

Plaintiff testified she was tired, but did not believe that was a direct effect of her medications. Plaintiff was taking medication for bipolar and depression for about a year (R. 489). She testified it helped. She also testified she had asthma that was pretty well controlled with medications. She did smoke. She testified she had problems with her memory and concentration. She could not watch a program on television because it just confused her. She could watch a movie.

Plaintiff testified she was able to pay her rent because her son was disabled and got an SSI check. She lived in assisted housing and had no income. Her son was able to take care of himself.

Plaintiff testified that Dr. Rezaian told her she had fibromyalgia that was affecting her joints and tendons and causing the pain all over her body (R. 492). She had migraines sometimes every two days, that could be debilitating. She said she had swelling in her hands and ankles. The ankle swelling was treated with gabapentin (neurontin), prescribed by Dr. Linus. She lay down several times a day every day. She napped during the day. The only housework she did was dusting, sweeping, and dishes. She used to cook and do other things, but "[i]t changed in '05." "It just got too hard for me to stand" (R. 495). Her mother did the cooking, and she, her son, and her mother all did the laundry together. She visited her sister once a week, about four miles away. There were days she did not even get out of bed.

She testified Dr. Jerand, her psychiatrist, said it was hard to tell the difference with fibromyalgia between bipolar and regular depression (R. 498).

The ALJ did not call a Vocational Expert.

At the Administrative Hearing held on August 22, 2008, Plaintiff's representative advised the ALJ that the only records missing were those from Plaintiff's rheumatologist, and those would be mailed out that day. At the end of the hearing, the ALJ advised he would leave the record open for a week so those records could be submitted (R. 499). The ALJ told the representative to "Make sure you send me anything that you think I need to see. I'd rather receive it twice than not receive it at all." No additional records were submitted to the ALJ before his decision on September 24, 2008. In the ALJ's Notice of Decision, he advised : "You should submit any new evidence you wish to the Appeals Council to consider with your request for review" (R. 8). Plaintiff submitted her request for review to the Appeals Council two months later, but did not submit any additional evidence. The Appeals Council did not enter its decision until April 21, 2009, a full eight months after the hearing, yet Plaintiff never submitted any further evidence.

Plaintiff submitted 112 pages of evidence for the first time to this Court, along with a "Motion to Remand on the Basis of New and Material Evidence" [Docket Entry 10].

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Swank made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2003.

2. The claimant has not engaged in substantial gainful activity since January 1, 2003, the alleged onset date (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, affective disorder, obesity and asthma ( 20 CFR §§

404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can bend, crawl, stoop, squat and climb stairs and ramps only occasionally. She cannot climb ropes, ladders or scaffolds. She is limited to simple, unskilled with [sic] requiring only limited contact with the public. She cannot work in environments with air pollutants/irritants.

6.     The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.     The claimant was born on January 25, 1970, and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.    The claimant has not been under a "disability," as defined in the Social Security Act, from October 31, 1998 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 11-20).

# IV. Contentions

A.  Plaintiff contends:

      1.      The Commissioner's decision is not based on substantial evidence as the ALJ arbitrarily selective [sic] and distorted the evidence in order to reach a conclusion of non-disability.

      2.      The Commissioner's decision is not based on substantial evidence as the ALJ failed to consult a Vocational Expert even though Biller had nonexertional impairments.

      3.      The Commissioner's decision is not based on substantial evidence as the ALJ did not properly address combination.

      4.      The Commissioner's decision is not based on substantial evidence as the ALJ failed to properly develop the record.[9]

B.  The Commissioner contends:

      1.      Plaintiff's argument that the ALJ distorted her daily activities is without merit.

      2.      Contrary to Plaintiff's argument, the ALJ was not required to consult a vocational expert.

      3.      The ALJ's decision comprehensively discusses plaintiff's impairments in combination.

      4.      Plaintiff's argument that the ALJ was required to develop the record by seeking out additional evidence is wholly without merit.

# V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and

---

[9]This argument is also the basis for Plaintiff's Motion to Remand for New and Material Evidence.

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citing Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case

before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.

1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper

standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an

improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

1987).

## B.  Need for Vocational Expert

Plaintiff argues the Commissioner's decision is not based on substantial evidence as the

ALJ failed to consult a Vocational Expert even though Plaintiff had nonexertional impairments.

Defendant contends that the ALJ was not required to consult a Vocational Expert.  Because the

undersigned finds this issue dispositive of the case, it is addressed first.

The ALJ found that Plaintiff has the severe impairments of degenerative disc disease of the

lumbar spine, affective disorder, obesity and asthma (R. 14).  The ALJ then found that Plaintiff had

the Residual Functional Capacity ("RFC") to perform simple, unskilled light work, with bending,

crawling, stooping, squatting, and climbing stairs and ramps only occasionally, limited contact with

the public, and no exposure to air pollution/irritants (R. 15).  He next found she could not perform

her past relevant work as a warehouse worker because it entailed greater exertional requirements that she was currently able to perform (R. 19).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983). Regarding the existence of available jobs which Plaintiff could perform, the ALJ in the instant case correctly states:

> If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limits, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making.

The ALJ then finds:

> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocation al Rule 202.21. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule. The need to avoid concentrated exposure to air pollutants/irritants does not significantly erode the unskilled occupational base (SSR 96-9p, SSR 83-12 and SSR 83-14). Postural limitations or restrictions related to climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching or crawling would not usually erode the occupational base for a full range of sedentary unskilled work significantly because those activities are not usually required in sedentary work (SSR 96-9p).

(R. 19-20). The first, and most obvious inconsistency in this finding is that the ALJ found Plaintiff could work at the light exertional level, but then finds that her postural limitations would not significantly affect the number of jobs available at the <u>sedentary</u> level. The second problem with the ALJ's finding is that he also expressly included in his RFC that Plaintiff could only occasionally bend, stoop, squat or climb stairs, and that she could only work at jobs that required only limited contact with the public. These additional limitations, found by the ALJ himself, were left out of his analysis of the availability of jobs Plaintiff could perform. The undersigned therefore cannot determine whether substantial evidence would support a finding that these limitations would not, especially in combination, erode the occupational base for a full range of light work.

In <u>Smith v. Schweiker</u>, 719 F.2d 723, the Fourth Circuit found:

> [N]ot every malady of a "nonexertional" nature rises to the level of a "nonexertional impairment." The proper inquiry . . . is whether a given nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. If the condition has that effect, it is properly viewed as a "nonexertional impairment," thereby precluding reliance on the grids to determine a claimant's disability.

The ALJ here has himself found Plaintiff had "nonexertional impairments." In <u>Grant v. Schweiker</u>, <u>supra</u>, the Fourth Circuit held that where a claimant demonstrates the presence of nonexertional impairments, the Secretary, in order to prevail, must be required to prove by expert vocational testimony that despite the claimant's combination of nonexertional and exertional impairments, specific jobs exist in the national economy which she can perform.

The ALJ here did not consult a Vocational Expert. Further, he did not include all of the nonexertional impairments he had actually found in his analysis of jobs that would exist that Plaintiff could perform. Finally, the ALJ's analysis was inconsistent in that, while he found Plaintiff could work at the light exertional level, he then found certain limitations, he then found certain limitations

would not erode the light exertional base while others would not erode the sedentary exertional base. For this reason alone, the undersigned United States Magistrate Judge finds this claim must be reversed and remanded to the Commissioner for further proceedings.

## C. Combination of Impairments

Plaintiff also argues the Commissioner's decision is not based on substantial evidence as the ALJ did not properly address combination. Defendant contends the ALJ's decision comprehensively discusses plaintiff's impairments in combination. 42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F) provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of <u>all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity</u>. If the Commissioner of Social Security does find a medically severe combination of impairments, <u>the combined impact of the impairments shall be considered throughout the disability determination process</u>.

(Emphasis added). The Fourth Circuit held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragmentize them. <u>Walker v. Bowen</u>, 889 F.2d 47, 49-50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."); <u>DeLoatche v. Heckler</u>, 715 F.2d 148 (4th Cir. 1983) (noting at page 150 that the most egregious error made by the ALJ was his "failure to analyze the cumulative or synergistic affect DeLoatche's various maladies have on her ability to work"). "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." <u>Walker</u>, <u>supra</u>, at page 50.

The undersigned first notes that the sole impairments found by the ALJ in Plaintiff's case are degenerative disc disease of the lumbar spine, affective disorder, obesity, and asthma (R. 14). There is no mention of headaches, migraines, carpal tunnel syndrome, kidney stones, ovarian cysts, fibromyalgia, anxiety disorder, pain disorder or Attention Deficit Disorder in the entire decision. While the ALJ may have determined any one or even all of these were not severe or even medically determinable impairments or that they did not meet the duration requirement, every one has been diagnosed and treated. Headaches and migraines are discussed in the record on at least ten occasions. Plaintiff was treated for migraines with Topamax and injections. Plaintiff testified her migraines might last two days at a time and were debilitating. It is undisputed that Plaintiff had kidney stones and/or stones in the urinary tract that caused severe pain and were diagnosed and treated, including with surgery. It is also undisputed she had at least one ovarian cyst. She wore wrist splints to the administrative hearing which she said were prescribed for her carpal tunnel syndrome by her rheumatologist, Dr. Rezaian, who also diagnosed fibromyalgia. She was at different times and by different mental health providers diagnosed with major depressive disorder, generalized anxiety disorder, bipolar disorder, chronic pain disorder, and ADHD. While some of these do qualify as "affective disorders," others (anxiety, ADHD, and chronic pain disorder) do not. Yet none of these alleged (and in some cases undisputed) impairments are mentioned even in order to dismiss them from consideration.

In Grant v. Schweiker, supra, the Fourth Circuit held:

Because *Grant* came forward with substantial evidence tending to show the presence of nonexertional impairments, we hold that it was error for the ALJ not to make findings as to the existence of those impairments and instead simply to apply conclusively the grid's Rules. Therefore, we must vacate the judgment of the district court with directions to remand the case to the Secretary for further proceedings, at

48

> which the Secretary is to determine whether Grant suffers nonexertional impairments
> in addition to his exertional impairment.

(Emphasis added). Here, Plaintiff came forward with substantial evidence tending to show the presence of nonexertional impairments (chronic pain, headaches, carpal tunnel syndrome, and additional mental impairments). "Therefore, we must vacate the judgment of the [Commissioner and remand] for further proceedings," at which the ALJ must determine whether Plaintiff suffers from these and any other nonexertional impairments in addition to those discussed in the decision.

In the case of Dr. Tuwiner, the ALJ appears to cite to his examination with approval, but does not indicate the weight given to the doctor's opinion. In fact, the only mention of weight in the entire decision is that the ALJ evaluated and considered the State agency reviewing physicians' conclusions and "g[ave] them appropriate weight in conjunction with other relevant evidence in rendering this decision. The weight accorded the state agency medical and psychological consultants, was not a controlling weight" (R. 18). In Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. See, e.g., Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977). As we said in Arnold: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

The ALJ failed to indicate the weight he accorded any of the medical reports. For this additional reason, Plaintiff's case must be remanded for further proceedings.

Regarding Dr. Tuwiner's opinion in particular, he examined Plaintiff for the State Disability Determination Service (R. 260). As the ALJ noted, Plaintiff's straight leg raising was inconsistent, with sitting SLR unremarkable, and lying with pain at 40 degrees bilaterally. All other ranges of motion were normal with no swelling, deformity, tenderness, or erythema. Strength was normal. Grip was normal. The ALJ then cites Dr. Tuwiner as opining only that "the claimant was exaggerating her symptoms" (R. 17); however, Dr. Tuwiner actually diagnosed bipolar disorder and depression, and opined that Plaintiff's "current psychiatric condition makes her embellish a lot of her current conditions" (R. 263), and her prognosis was contingent upon adherence to multidisciplinary therapy. Although he found she could work at the light exertional level, he opined she "had a severe mental illness, which may have other implications with respect to work." The Defendant might argue, and the undersigned might even agree, that Dr. Tuwiner was not a psychiatrist and therefore his opinion regarding Plaintiff's psychological state need not be accorded any significant weight; however, the ALJ did not do so.[10] As already stated, the ALJ did not state what, if any, weight he accorded any of the medical records, including Dr. Tuwiner's.

Clearly, at least one examining physician opined that Plaintiff's mental impairments may have been exacerbating her symptoms. At other times she is diagnosed with chronic pain, which may also be an additional impairment affecting her both mentally and physically.

The undersigned finds the ALJ did not even discuss a number of Plaintiff's alleged and even

---

[10]And in fact, the undersigned is unaware of Dr. Tuwiner's specialty, but is aware of medical doctors who are also licensed mental health providers.

diagnosed impairments, and therefore clearly did not discuss them in combination throughout his decision. The undersigned therefore finds substantial evidence does not support the ALJ's determination and this matter must be reversed and remanded for further proceedings.

## D. Daily Activities

Plaintiff also argues the Commissioner's decision is not based on substantial evidence as the ALJ "arbitrarily selected and distorted the evidence in order to reach a conclusion of non-disability." Defendant contends Plaintiff's argument that the ALJ distorted her daily activities is without merit. The undersigned agrees with Defendant. At the hearing in August 2008, Plaintiff did testify that her mother and son did all the grocery shopping, that she did not prepare any food, and that she did not do any child care, that her son could take care of himself, and that she had problems with memory and conversation. She specifically testified, that she had stopped making food in about 2005, and again, that she used to cook and do other things, but "[i]t changed in '05, it just got too hard for me to stand."

As late as March 2006, however, Plaintiff herself reported she prepared her own meals daily, including making complete dinners. She could do the laundry if someone helped carry it. She shopped two times a month for 1-2 ½ hours each time. Her hobbies and interests included puzzles and sewing three times a months and reading every day. Her friends visited her on Saturdays and they would sit around talking and playing cards. Her memory, concentration and understanding were not affected, and she was able to following instructions, use her hands, and get along with others. She could pay attention "for hours," finish what she started, and could follow written and spoken instructions very well. Her own list of daily activities included getting her son up for school, making sure he got on the bus, making her bed and her son's bed, cleaning the bathroom, finishing

chores, making dinner, reading with her son, and helping him clean up his room.

In August 2006, Plaintiff said she attempted some vacuuming and light dusting and helped with the cooking if her back was not too bad. She was learning to crochet. She helped take care of her son who was handicapped. At various other times she said her son was "neurologically impaired," or mentally retarded. In November 2006, Plaintiff said she was in considerable pain "because she had to help her mother move things out of the kitchen." In October 2007, Plaintiff reporting she was caring for her son after his two surgeries.

The undersigned notes the record covers a long period of time, during which Plaintiff moved a number of times and saw many different physicians and mental health providers. She was diagnosed with numerous different impairments, both physical and mental, and was treated in various ways for those impairments. Some mental health providers diagnosed her with physical impairments and some primary care providers diagnosed her mental disorders. Many of these diagnoses were inconsistent with each other. Some doctors found she exaggerated her symptoms and that her reports were inconsistent. As she was treated in different ways, she responded differently. The ALJ correctly and properly noted the final record before him, in which, on May 5, 2008, Plaintiff stated she had no pain with the patch. The report is a bit confusing, but does note specifically that Plaintiff had "0 pain w/ patch!" (Exclamation in original) and that she was getting "much relief!" from Fentanyl patch (Exclamation again in original). Her anger and anxiety were down to a 2 on a scale of 0-10 (with 10 being best) and all else was rated as 0 on a scale of 0-10, including depression and social isolation.

The undersigned finds that the ALJ did not "arbitrarily select and distort the evidence in order to reach a conclusion of non-disability," and that substantial evidence supports his conclusions

regarding Plaintiff's daily activities.

### E. Failure to Develop the Record.

Plaintiff next argues the Commissioner's decision is not based on substantial evidence as the ALJ failed to properly develop the record. Defendant contends that Plaintiff's argument that the ALJ was required to develop the record by seeking out additional evidence is wholly without merit. The undersigned does not find that the ALJ erred by failing to develop the record. The record in this case is quite extensive and includes numerous health care providers. Some are not named even in the reports. Some reports are almost totally illegible. It seems to the undersigned reasonable that a simple mention of a physician's name one or two times is not enough to put the Commissioner on notice that this physician must be contacted. Over a month before the hearing, Plaintiff was sent a letter expressly instructing:

> **You May Submit Additional Evidence and Review Your File**
> If there is more evidence you want to submit, get it to me right away. If you cannot get the evidence to me before the hearing, bring it to the hearing. If you want to see your file before the date of the hearing, call this office.

(R. 29). Plaintiff did not submit additional records at the hearing. Plaintiff had a retained representative (albeit a non-attorney). That representative assured the ALJ that the rheumatologist's records would be forthcoming. In fact, they would be in the mail that very day. The ALJ even said to "make sure that you send me anything that you thing I need to see. I'd rather receive it twice than not receive it at all" (R. 500). No additional records were ever sent. Following the ALJ's decision, in his Notice of Decision, he advised : "You should submit any new evidence you wish to the Appeals Council to consider with your request for review" (R. 8). Plaintiff submitted her request

for review to the Appeals Council two months later, but did not submit any additional evidence.

The undersigned does not find the Commissioner erred by failing to search for evidence that neither Plaintiff nor her representative provided.

## VI. Motion for Remand

The undersigned finds the above determinations render Plaintiff's Motion for Remand based on new evidence moot. Further, the undersigned finds the Motion should be denied. A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir.1983). It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. King v. Califano, 599 F.2d 597, 599 (4th Cir.1979); Sims v. Harris, 631 F.2d 26, 28 (4th Cir.1980). There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the remanding court "at least a general showing of the nature" of the new evidence. King, 599 F.2d at 599. Borders v. Heckler, 777 F.2d 954 (4th Cir. 1985).

Even if the other three criteria were met, the undersigned finds there was not good cause for Plaintiff's failure to submit the evidence when the claim was before the Secretary. As noted above, Plaintiff was advised on at least three different occasions to submit any evidence she wanted considered to the Commissioner. Even after the ALJ's decision, Plaintiff was advised she could submit additional evidence to the Appeals Council. There is no "good cause" requirement for

submitting new evidence to the Appeals Council. The Appeals Council decision was not rendered until April 21, 2009, a full seven months after the ALJ's decision, yet Plaintiff did not submit any additional evidence. The undersigned therefore finds there is not good cause shown for the failure to submit the records to the Administration.

There are a few records submitted to the Court which were created after the Appeals Council decision, and were therefore arguably not available to Plaintiff while her case was before the Administration. These records may or may not be material. A review of the records since April 2009, does not indicate that any refer back to Plaintiff's condition prior to September 24, 2008, the date of the ALJ's decision, and would therefore not be considered relevant to the time at issue or material. The undersigned therefore finds that Plaintiff's Motion for Remand Based on New and Material Evidence should be DENIED.

## VII. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for SSI and DIB, and I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 18] be **DENIED**, and Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 17] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation. The undersigned further recommends that Plaintiff's Motion for Remand Based on New and Material Evidence [Docket Entry 10] be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 2 day of July, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE